IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
MDL DOCKET NO.: 3:03CV1558
Related Case: 3:04cv160

| | |
|---|---|
| IN RE AIR CRASH AT CHARLOTTE INTERNATIONAL AIRPORT ON JANUARY 8, 2003 | ) ) ) ) ) |
| DOUGLAS LYNN SHEPHERD, as personal representative of the Estate of Christiana Shepherd, deceased,<br><br>Plaintiff,<br><br>v.<br><br>MESA AIR GROUP, INC.; AIR MIDWEST, INC.; US AIRWAYS GROUP, INC.; US AIRWAYS, INC.; L-3 COMMUNICATIONS AEROTECH, L.L.C. f/k/a VERTEX AEROSPACE, LLC f/k/a RAYTHEON AEROSPACE, LLC; STRUCTURAL MODIFICATION and REPAIR TECHNICIANS, INC.; PIEDMONT AIRLINES, INC.; RAYTHEON COMPANY and RAYTHEON AIRCRAFT COMPANY,<br><br>Defendants. | ORDER |

THIS MATTER is before the Court on Douglas Shepherd's Motion for Order Approving Settlement (Under Seal), filed on May 2, 2005. The McLario, Helm & Bartling, S.C. ("McLario") law firm filed its Response and an Application for Order to Show Cause on May 16, 2005. On May 31, 2005, Baum Hedlund, A Professional Corporation ("Baum Hedlund"), filed its Reply. On June 13, 2005, McLario filed a Supplemental Reply. This motion is now ripe for

1

disposition by the Court.

Having carefully considered the arguments, the record, and the applicable authority, for the below-stated reasons the Court will award McLario, Helm & Bartling, S.C. costs and attorneys' fees in the amount of $19,750.00. The Court otherwise grants Douglas Shepherd's Motion for Order Approving Settlement.

## I. FACTUAL AND PROCEDURAL HISTORY

### A. Background

On January 8, 2003, Air Midwest Flight 5481 crashed into a US Airways' hangar at Charlotte-Douglas International Airport, killing the 19 passengers and two crew members on board. Among the deceased was Christiana Shepherd, a college freshman at Bob Jones University. Christiana was the daughter of Douglas Shepherd ("Mr. Shepherd") and Tereasa Shepherd ("Ms. Shepherd"), both missionaries in the Azores.

On January 20, 2003, the Shepherds met with attorney John McLario of the Wisconsin law firm McLario, Helm & Bertling, S.C. in Greenville, South Carolina. The circumstances surrounding this meeting, which resulted in the Shepherds' retaining McLario to represent them in a wrongful death action, are in dispute. The Shepherds contend that the director of their missionary organization, Gospel Fellowship Association ("GFA"), contacted them shortly after the plane crash and notified them that an attorney from Wisconsin, Mr. McLario, would be arriving shortly to discuss representing them. (Douglas Shepherd Decl. ¶ 5). The Shepherds believed that Mr. McLario, who also worked for GFA, would represent them *pro bono*. (*Id.* ¶ 7). They were therefore surprised when Mr. McLario not only indicated that he would not be handling their case *pro bono*, but further presented the Shepherds with a pre-printed contract

2

retaining McLario to represent them on a contingency basis. (*Id.* ¶ 8). The Shepherds reluctantly signed the contract. (*Id.*).

Mr. McLario, on the other hand, maintains that GFA contacted him on January 16, 2003, pursuant to a request made by the Shepherds, and asked if he would be willing to meet with the Shepherds in Greenville to discuss the possibility of a lawsuit. (John McLario 2nd Aff. ¶ 9). Mr. McLario denies soliciting the meeting with or business of the Shepherds in any way.[1] (*Id.* ¶ 10). Mr. McLario agreed to meet with the Shepherds in Greenville, and after first meeting them at a luncheon on January 19, 2003, he again met with them on January 20 to discuss the logistics of a potential wrongful death action. (*Id.* ¶¶ 12, 13). At the January 20 meeting, Mr. McLario avows that Ms. Shepherd insisted that she did not expect *pro bono* representation and specifically stated that she wanted a contingent fee arrangement. (*Id.* ¶ 13). In fact, according to Mr. McLario, prior to this meeting, Ms. Shepherd had already spoken with several attorneys who had quoted her contingent fees ranging from twenty-five percent (25%) to forty percent (40%). (*Id.*). Mr. McLario then presented the Shepherds with a written reservation agreement which stipulated a one-third contingent fee. (*Id.* ¶14). Ms. Shepherd found this amount appropriate and she and her husband signed the contract. (*Id.* ¶¶ 15, 16). Mr. McLario later stated that he intended to reduce the attorneys' fees and make a donation to the Shepherds' missionary organization once a settlement was reached. (John McLario 1st Aff., Exhibit C). Despite the conflicting accounts, McLario agreed to represent the Shepherds for one-third of the recovery plus expenses.

---

[1] Baum Hedlund suggests that Mr. McLario's conduct was unethical and in violation of the Federal Aviation Disaster Family Assistance Act, which presently prohibits attorneys from soliciting representation of families of airline accidents for a period of 45 days from the date of the accident. (Baum Hedlund Reply p. 16).

3

Once retained, McLario determined that the National Transportation Safety Board ("NTSB") would effectively establish liability through an investigation of the crash and therefore the firm focused its efforts on demonstrating the value of Christiana Shepherd's life. (McLario Resp. p. 3). To this end, McLario gathered statements from friends, roommates, and acquaintances of Christiana. (*Id.* p.3). Mr. McLario then forwarded several documents, including character statements, to the insurance adjuster to initiate settlement discussions. (*Id.*). Mr. McLario alleges that those discussions resulted in a verbal one million dollar settlement offer made by AIG Aviation ("AIG") insurance adjuster Glenda Barth ("Ms. Barth") during a March 4, 2003 telephone conversation. (John McLario 2nd Aff. ¶¶ 23, 24). AIG is the primary insurer for Air Midwest, Mesa Air Group, and US Airways. (Anthony Faiia Decl. ¶ 1). Ms. Barth indicated that this was an opening offer and that the insurance carriers would meet with Mr. McLario and the Shepherds if this amount was not acceptable. (John McLario 2nd Aff. ¶ 24). In contrast to Mr. McLario's recollection of these events, AIG's Executive Vice President stated that he authorized the one million dollar settlement offer on January 17, before receiving any materials from McLario or the Shepherds.[2] (Anthony Faiia Decl. ¶¶ 1-3). In fact, as of January 17, the Shepherds had neither met nor retained McLario.

On March 7, 2003, at 11:31 a.m. EST, McLario received a fax that contained AIG's written communication of the one million dollar offer, as well as several structured settlement options. (John McLario 1st Aff. p. 2; Clara Seidel Decl., Exhibit E). Prior to that, at 6:57 a.m. EST on March 7, the Shepherds faxed a letter to Mr. McLario indicating that they had retained

---

[2] One million dollars was the minimum settlement amount offered for any decedent arising out of the plane crash. (Anthony Faiia Decl. ¶¶ 1-3).

4

another law firm, Baum Hedlund, and thus were discharging McLario. (Douglas Shepherd Decl. ¶ 12). The Shepherds were dissatisfied with the quality of McLario's representation and felt a law firm with more experience in aviation litigation would be better. (*See* Tereasa Shepherd Decl. ¶¶ 10-15; Douglas Shepherd Decl. ¶¶ 10-11). Moreover, Baum Hedlund agreed to represent the Shepherds for a 20% contingent fee, including costs. (Douglas Shepherd Decl. ¶ 12). After receiving the fax, Mr. McLario called the Shepherds to discuss their decision and inform them of the one million dollar offer. (John McLario 2nd Aff. ¶ 29). The Shepherds confirmed during this conversation that they had discharged McLario and hired Baum Hedlund to represent them. (Tereasa Shepherd Decl. ¶ 14).

Shortly after his discharge, on March 17, Mr. McLario sent Baum Hedlund copies of the documents from the Shepherds' case file that he felt were substantive, including witness statements. (Paul Hedlund Decl., Exhibit A; John McLario 2nd Aff. ¶ 33). Subsequently, on January 28, 2004, Mr. McLario sent Baum Hedlund the entire case file on the Shepherds. (Paul Hedlund Decl. ¶ 2). This 98-page file consisted of 36 documents, including news articles about the crash, North Carolina case law printed off of Westlaw, and several hand-written notes made by Mr. McLario. (*See* Paul Hedlund Decl., Exhibit A). At Baum Hedlund's request for the itemized *expenses* McLario had incurred up to that point, Mr. McLario sent Baum Hedlund the contingent fee arrangement he had with the Shepherds and stated that he did not wish to be reimbursed for his *fees and costs* until the case was resolved, either by trial or settlement. (McLario Resp. p. 4; John McLario 1st Aff., Exhibit G). Aside from sending his file on the Shepherds to Baum Hedlund, Mr. McLario had no further communications with the Shepherds after McLario's termination and played no further part in pursuing a wrongful death action.

(McLario Resp. p. 4). McLario's time records indicate that it spent a total of 128.6 hours working on the Shepherds' case.³ (*See* McLario Resp., Exhibit A). McLario's standard billing rate is $250 per hour. (*Id.*). Additionally, McLario incurred a total of $460.79 in costs. (Baum Hedlund Reply, p. 5).

Baum Hedlund has represented the Shepherds from March 7, 2003 until the present. During this time period, Baum Hedlund spent a total of 3,315 hours and $65,866.45 working on the Shepherds' case. (Baum Hedlund Reply p.5).⁴ Baum Hedlund, who was also representing the family of another victim of the same airplane crash, focused its efforts on both settlement negotiations and trial preparation. (Ronald Goldman Decl. ¶ 1). The trial preparation was necessary due to the perceived difficulty of achieving the Shepherds' additional demands for accountability and a public apology by the Defendants. (*Id.* ¶¶3-4). Pursuant to this two-pronged strategy, Baum Hedlund conducted pleadings and discovery, held bi-weekly and monthly meetings to discuss the status and progression of the case, and consulted several relevant experts, including pilot attorneys. (John Greaves Decl. ¶4; Baum Hedlund Reply p. 13). Several

---

³Baum Hedlund disputes McLario's total hours worked, noting that 55.2 hours of the 128.6 hours recorded in the time log were events that occurred before McLario was retained or after it was discharged. (Baum Hedlund Reply, pp. 3, 5; *see also* McLario Resp., Exhibit A). Baum Hedlund further alleges that one of the documents contained in the file Mr. McLario sent to Baum Hedlund had been printed off of the Internet more than one month after McLario was discharged. (Paul Hedlund Decl. ¶ 5).

⁴ McLario argues that the total amount of hours Baum Hedlund alleges to have spent on the Shepherds' case is inflated due to the fact that some of this time was spent working on issues, such as liability and punitive damages, that were common to both the Shepherds' case and the case of another family who had a victim in the airline crash and was also represented by Baum Hedlund. (McLario Supplemental Reply p. 3). McLario further emphasizes the exaggerated nature of the figure by pointing out that Baum Hedlund often used multiple attorneys and paralegals to handle a single activity. (*Id.* pp. 4-5).

6

members of the Baum Hedlund team attended two NTSB hearings in Washington, D.C. (John Greaves Decl. ¶ 9).

On June 28, 2004, Baum Hedlund participated in a ten hour mediation before retired Judge Daniel Weinstein in Los Angeles, California. (*Id.* ¶ 10). After this mediation proved unsuccessful, Baum Hedlund participated in a second mediation before Magistrate Judge David Keesler of the Western District of North Carolina. (*Id.* ¶ 14). In preparation for this second mediation, Baum Hedlund employed the services of a national jury consulting firm and subsequently arranged and conducted two focus groups in North Carolina. (Ronald Goldman Decl. ¶ 8). The second mediation before Magistrate Judge Keesler occurred on September 13, 2004 and was also unsuccessful. (*Id.* ¶ 9) Ultimately, Baum Hedlund negotiated a settlement between the parties, and on April 25, 2005 informed Mr. McLario via telephone that it had reached a settlement on behalf of the Shepherds. (*Id.* ¶ 19). The draft motion Baum Hedlund sent to McLario the following day revealed that Baum Hedlund was seeking to keep the entire amount designated as attorneys' fees, contending that McLario's work was of no value. (McLario Resp. p. 4). Mr. McLario indicated that he was seeking *quantum meruit* recovery, but Baum Hedlund contends that Mr. McLario did not provide them with a basis for that claim until the present motion was commenced. (Ronald Goldman Decl. ¶ 19).

## B. McLario's Demand For *Quantum Meruit* Recovery

McLario seeks to recover the reasonable value of its services in *quantum meruit* for its work on the Shepherd case prior to its March 7 discharge. Specifically, McLario requests $200,000 from the attorneys' fees generated by the final settlement. Baum Hedlund argues that McLario is not entitled to recover any attorneys' fees because its work product was of no or *de*

*minimus* value to Baum Hedlund. Baum Hedlund concedes that the two witness statements gathered by McLario were potentially useable, though not actually used by Baum Hedlund, which comprised 16.9 hours of McLario's total time spent on the Shepherd case.

## II. DISCUSSION

An attorney who is initially retained pursuant to a contingent fee arrangement and subsequently discharged by the client before the final disposition of the case may not recover attorneys' fees based on the contract amount, but only on the reasonable value of his or her services prior to termination. *Guess v. Parrott*, 160 N.C.App. 325, 330-31, 585 S.E.2d 464, 468 (2003) (citing *Covington v. Rhodes*, 38 N.C.App. 61, 63, 247 S.E.2d 305, 307 (1979)); *Potts v. Mitchell*, 410 F. Supp. 1278, 1282 (W.D.N.C. 1976). Factors appropriately considered when assessing the reasonable value of an attorney's services include: (1) the terms of the percentage agreement; (2) the nature of the litigation; (3) the novelty and difficulty of the case; (4) the time and labor spent; (5) the amount of money involved; (6) the results achieved and the benefits resulting to the client; (7) amounts customarily charged for similar services in the same locality; (8) the experience and skill of the attorney; and (9) the adequacy of the representation. *Guess*, 160 N.C.App. at 335-36, 585 S.E.2d at 471 (citations omitted). Alternatively, a court may award attorneys' fees based on charges for hourly work and then adjust that amount upward or downward to reflect the true value of the services to the client, if the court feels that this aptly characterizes the contribution of the discharged attorney. *Id.* at 472.

McLario maintains that based on its initial contract with the Shepherds, the one million dollar settlement offer it procured, and the time and resources it spent representing the Shepherds, it is entitled to a substantial amount of the money reserved for attorneys' fees in the

8

final settlement, as opposed to recovery based only on its hourly work. Baum Hedlund, on the other hand, claims that McLario's work product, aside from the witness statements, was useless and therefore should not afford McLario any recovery in *quantum meruit*.

It is clear to this Court that McLario was primarily interested in demonstrating the value of Christiana Shepherd's life in its prosecution of this wrongful death action. In order to assess the damages caused by Christiana's death, McLario needed to display the present value of Christiana's projected stream of earnings. It is recognizable that in order to calculate such damages on behalf of a young, college student such as Christiana, a number of assumptions would have to be made and a number of scenarios generated. In order to ascertain those assumptions and scenarios, Mr. McLario talked to several people, including friends and roommates of Christiana, from which a professional economist could formulate an opinion with some degree of reliability. However, it is equally clear to the Court that McLario did not get very far in this process. Most notably, the cost of consulting a competent economist would be considerably greater than $460, which was the total amount of costs incurred by McLario.

While the Court remains uncertain as to the usefulness of some of the work product that McLario produced, it feels that $150 per hour for the total 128.6 hours McLario spent on the Shepherds' case, plus costs in the amount of $460, adequately reflects the value of McLario's contribution.

Based on the foregoing,

**IT IS THEREFORE ORDERED** that Douglas Shepherd's Motion for Order Approving Settlement is **GRANTED** with regard to the total settlement amount.

**IT IS FURTHER ORDERED** that Baum Hedlund pay McLario, Helm & Bartling, S.C.

$19,750.00 of the contingency fees generated by the final settlement.

This 28th day of July, 2005.

Graham C. Mullen
Chief United States District Judge